| | |
|---|---|
| DELBELLO DONNELLAN WEINGARTEN<br>WISE & WIEDERKEHR, LLP<br>*Proposed Attorneys for the Debtors*<br>One North Lexington Avenue<br>White Plains, New York 10601<br>(914) 681-0200<br><br>Jonathan S. Pasternak, Esq.<br>Erica Feynman Aisner, Esq. | Hearing Date: June 3, 2014<br>Hearing Time: 3:00 p.m. |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
In re:                                                                    Chapter 11

ALEXANDER M. WALDMAN DIAMOND CO., INC.,                                  Case No. 14-11660 (MG)

                    Debtor.
------------------------------------------------------------------------X
In re:                                                                    Chapter 11

WALDMAN DIAMONDS COMPLETE, LLC,                                          Case No. 14-11661(MG)

                    Debtor.
------------------------------------------------------------------------X

**DEBTORS' MOTION, ON SHORTENED NOTICE, FOR AN
ORDER (I) AUTHORIZING THE DEBTORS' USE OF CASH
COLLATERAL PURSUANT TO 11 U.S.C. §363(c)(2) AND
BANKRUPTCY RULE 4001 ON AN INTERIM BASIS, AND
PROVIDING ADEQUATE PROTECTION THREFOR
PURSUANT TO 11 U.S.C. §§361 AND 362 AND
<u>(IV) SCHEDULING A FINAL HEARING</u>**

Alexander M. Waldman Diamond Co., Inc. ("<u>Waldman</u>") and Waldman Diamonds

Complete, LLC ("<u>Complete</u>"), the above captioned debtors and debtors-in-possession

(collectively, the "<u>Debtors</u>"), by their proposed attorneys, DelBello Donnellan Weingarten Wise

& Wiederkehr, LLP, files this motion (the "<u>Motion</u>") for entry of an Order Scheduling a

Preliminary Hearing on the Debtor's Motion Requesting the Use of Cash Collateral, (II)

Authorizing Debtor's Use of Cash Collateral Pursuant to 11 U.S.C. §363 and Providing

1

Adequate Protection Therefor Pursuant to 11 U.S.C. §§361 and 362 and (III) Scheduling a Final Hearing, respectfully state and represent as follows:

**Jurisdiction**

1.  This Court has jurisdiction over this Motion under 28 U.S.C. §§ 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion is proper in this District pursuant to 28 U.S.C. §§1408 and 1409.

2.  The statutory bases for the relief requested herein are §§ 105(a), 361, 362 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**BACKGROUND**

3.  On May 30, 2014 (the "Filing Date"), the Debtors, respectively, filed voluntary petitions for reorganization pursuant to Chapter 11 of the Bankruptcy Code and were continued in possession of their property and management of their affairs as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

4.  On the Filing Date, the Debtors' filed a motion with the Bankruptcy Court seeking authority to jointly administer their respective chapter 11 cases, for procedural purposes only. That motion is currently is *sub judice*.

5.  No committee, trustee or examiner has been appointed heretofore in these Chapter 11 cases.

6.  Debtor Alexander M. Waldman Diamond Co., Inc. ("AWDC") was founded in 1978 by Alex Waldman, a first generation diamantaire. The company's business is focused primarily on the purchase and sale of loose polished diamonds, mostly to Trade customers – small and medium sized jewelry chains and independent retailers, as well as internet retailers

2

such as Blue Nile. 97% of the sales are domestic with most of the remainder to an associated company in Vancouver, Canada. AWDC is located in the heart of the diamond district on 47th Street in NYC and currently employs 8 full time staff. Some 70% of the inventory is sourced from AWDC's sister company in Israel, which purchases on the wholesale diamond exchange in Ramat Gan and from manufacturers in India. Most of the remaining goods are sourced on a consignment basis from wholesalers in NY.

7.  Debtor Waldman Diamonds Complete, LLC ("WDC") was founded in 1999 manufactured and sold diamond jewelry to a similar customer base as that of Waldman. However, Complete's product line is exclusively finished pieces as opposed to the sale of loose stones that Waldman engages in.

8.  Over the years, Complete experienced a series of changes in business model which, exacerbated by Leumi's unwillingness to continue the business, led it its ultimate demise and current wind down status. Examples include the relocation of Complete's base of manufacturing from New York to India which resulted in quality control issues and higher return rates. The design focus was shifted from high quality, high inherent value (gold and diamond content) pieces of classic and timeless design to lower quality, more trend oriented pieces require new designs yearly and higher rate of devaluation of inventory as trends change. Complete began offering a higher volume consignment program to customers for extended periods of time which left the company which resulted in higher manufacturing costs for lower quality goods which were never sold. This consignment program created a situation where retrieving consignment inventory from customers all over the world became problematic when Leumi ceased financing operations and even upon recovery, had lower liquidation values. In fact, Complete's sales were focused on two large customers in Mexico and Panama which has made collection on

3

outstanding receivables very difficult.

9. Typically, Waldman has paid all of the general and administrative expenses of Complete, as they shared offices and certain personnel, and Complete was simply charged the associated cost and reconciled in connection with intercompany transactions. However, this reconciliation proved difficult when Complete showed continuing losses and could not even remain current on its non-insider debt.

10. Exacerbated by Leumi's unwillingness to further fund, Complete's management decided to close the operation entirely and have been working to orderly liquidate its assets since November 2013.

11. The Debtors are both majority owned and operated by their President, Alex Waldman.

12. Waldman's business, which operates primarily from its New York office which is located in the heart of the diamond district on 47th Street in New York City, is focused primarily on the purchase and sale of loose polished diamonds, mostly to trade customers – small and medium sized jewellery chains and independent retailers which includes internet retailers.

13. Complete manufacturers and sells diamond jewellery to a similar customer base as that of Waldman. However, Complete stopped operating due to continued losses and has been engaged in an orderly liquidation of its assets since November of 2013.

14. Waldman has realized revenues in the range of $25 to $30 million over the past several years and has remained profitable and viable to date, enjoying an excellent reputation in the industry.

**The Leumi Obligations**

15. Bank Leumi USA ("Leumi") has had a long standing banking arrangement with the Debtors during which time it entered into a series of revolving secured credit agreements.

16. On or about September 19, 2011, Leumi extended a $13 million revolving credit facility to the Debtors (the "Credit Facility"). In connection therewith, on or about November 1, 2013, Waldman executed a promissory note in favor of Leumi with an aggregate principal amount of no more than $7 million ("Waldman 2013 Note"), a copy of which is annexed hereto as **Exhibit "A"** and made a part hereof. The Waldman 2013 Note provided that it would mature, with all sums being due, on February 1, 2014.

17. On or about October 31, 2013, as security for the outstanding obligations due Leumi by the Debtors, the Debtors executed identical separate security agreements ("Security Agreement(s)") granting essentially a blanket lien on the Debtors' respective assets, possessory and non-possessory (as described more fully therein). Copies of the Security Agreements are annexed hereto as **Exhibits "B" and "C"** respectively and made a part hereof.

18. Presumably in connection with prior and anticipated future extensions of credit, on or about July 20, 2010, Leumi filed UCC-1 financing statements indicating its lien against the assets of the respective Debtors. Copies of the respective UCC-1 filings are annexed hereto as **Exhibits "D" and "E"** respectively and made a part hereof.

19. Leumi is the only creditor of either Debtor which asserts a lien in the Debtors' assets. However, it should be noted that UCC-1 financing statements have been filed by two of the Debtors' suppliers, Elefant Diamonds, LCC and Waldman Trading Company, Inc., an affiliate of the Debtor and one of its suppliers, whose filings are notices of consignment indicating their respective ownership of certain goods in the possession of the Waldman.

20.     The obligations due Leumi by the Debtors have been guaranteed by Alexander Waldman and Leonard Waldman as well as Complete, and each executed separate guarantees, copies of which are annexed hereto as **Exhibits "F", "G" and "H"** respectively and made a part hereof.

21.     As of the Filing Date, the Debtors estimate that there was approximately $6.1 million dollars due to Leumi under the Waldman 2013 Note[1].

**Problems leadings up to Chapter 11 filings**

22.     The Debtors' collective financial problems are the result of a number of factors.

23.     With respect to Complete, there were a number of different managers and partners, each with varying degrees of success. In 2011 Complete hired a new managing director who made massive changes in personnel, business model and operations which had disastrous results. Continuing losses in Complete placed strains on Waldman as both companies were jointly responsible on the obligations to Leumi which reduced its borrowing base as the problems with Complete grew.

24.     In or about the same time, the Debtors began to experience erratic treatment by Leumi. For example, following the extension of the $13 million Credit Facility in September of 2011 and a significant investment in greater inventory, Leumi, presumably concerned about its own exposure in the industry at large, began insisting on substantial reductions in the overall indebtedness. From December 2011 through November, 2013, the Debtors, to their own detriment, made enormous efforts to satisfy the bank's extreme demands and paid down the line of credit by approximately $3.7 million!  Meanwhile, these pay downs meant that the Debtors could not afford to replace inventory reductions which meant lower sales volumes and thus,

---

1 Upon information and belief, Leumi set off various Debtor and guarantor accounts under its control just shortly prior to the Filing Date in the approximate amount of $350,000.  Debtors have yet to receive notice or any accounting on how the funds were applied to the Debtors' outstanding loan obligation.

6

lower revenues.

25. Leumi had verbally promised the Debtors' principal that if the credit line was reduced to $7 million, cross-guaranties imposed by Leumi between the two companies would be released which would allow the Debtors to obtain new investors to infuse capital necessary to help grow the operations and increase revenues. Unfortunately, Leumi never followed through with this promise and new funding was not an option.

26. The timing of these events coincided with two other exacerbating factors. First, the Debtors' principal was engaged in a protracted and contentious divorce proceeding which placed restrictions on his personal assets and therefore prohibited him from injecting any new capital into the businesses. Second, diamond prices and demand fell dramatically in the second quarter of 2011 and they have yet to fully recover.

27. Following heavy losses in 2012-13 and due to an inability to see any viable options as to how to recover, Complete's management decided to close the operation entirely and have been working to liquidate the assets since November 2013. Unfortunately, due to the market conditions and the financial pressures from Leumi, Complete has been forced to sell off inventory at significantly depressed prices causing further losses.

28. Over the past few months, the Debtors and their professionals have been engaged in good faith negotiations with both Leumi and its counsel in order to negotiate a consensual pay-down of the overall indebtedness in a manner that would not jeopardize the viability of Waldman as a going concern. In fact, the Debtors advised Leumi recently that they were in the process of obtaining a commitment from another lender who would refinance the Leumi obligations.

29. Despite the Debtors' ongoing efforts to negotiate with Leumi, the long standing banking relationship and the nearly $20 million dollars in transactions annually which the Debtors have collectively conducted through Leumi's accounts, Leumi has engaged in tactics which have consistently threatened the companies' operations. For example, Leumi has prevented transfers from Waldman to its affiliate company in Israel who is its major supplier of inventory, thereby crippling its ability to maintain inventory levels which directly relates to its sales volume. Leumi has unilaterally and without any notice, set-off funds from the Debtors' accounts, (on one recent occasion in the amount of approximately $350,000), which interfered with the Debtors' already strained cash flow and budgeting. Leumi has even gone so far as to actually stop payments made by the Debtors to suppliers and vendors, again without notice, jeopardizing operations as well as key business relationships.

30. Leumi's demands were, in the Debtors' opinion, consistently unreasonable and/or capricious, typically carrying with them unreasonably short deadlines and even more outrageous, with such demands often arriving within *hours* of the start of the Debtors' shut down of operations for Shabbat observance or other religious holidays.

31. The Debtors recently learned and Leumi has verbally confirmed that it intends to cease all lending to the diamond and jewelry industry. Unfortunately Leumi's efforts to end its business relationship with the Debtors, if gone unchecked, would certainly have ended the Debtors' business altogether.

32. The Debtors believe that they may have claims against Leumi as it has acted as a "person in dominion and control" of the Debtors' assets possibly resulting in a claim for equitable subordination and/ or lender liability.

33. Notwithstanding these difficulties, the Debtors have continued in good faith to negotiate and comply, when possible with Leumi's demands. The Debtors have provided exhaustive financial information and disclosures on a constant basis as well as paying for significant expenses incurred and assessed by Leumi for auditing and outside counsel fees. The Debtors have also remained current with debt service payments to date despite the loans having been called in default in March 2014.

34. Now, while actively engaged in negotiations, Leumi, without any prior notice to the Debtors or their counsel, filed a replevin action in New York County State Court. In connection therewith, Leumi moved *ex parte* without any prior notice to counsel by Order to Show Cause seeking an injunction which would have caused the immediate shut down of the Debtors' operations. Furthermore, upon judgment, Leumi's intention to liquidate the companies in a "firesale" would not only benefit only Leumi but there would likely be a significant deficiency due.

35. The filing of the State Court action and specifically the request for a temporary restraining Order forced the Debtors' hands. In order to protect Waldman and its continued profitable operations as well as to protect Complete, the maximization of its value and ensure an orderly wind down and liquidation, the Debtors in good faith filed these Chapter 11 cases.

36. The Debtors intend to utilize the protections of Chapter 11 to protect their operations, restructure its obligations and complete the orderly wind down of Complete. By doing so, the Debtors will be able to propose a Chapter 11 plan(s) that is in the best interest of **all** of its creditors and affords them the greatest recovery possible.

## Relief Requested

37.     The Debtors submit this Motion pursuant to Bankruptcy Code §363(c)(2)(B) and 361 and 362 and Bankruptcy Rule 4001(b) with respect to the Debtors' request for authority to use property which may constitute cash collateral ("Collateral") in which Leumi asserts a security interest, substantially in accordance with the terms and conditions set forth in the proposed Interim Order (the "Order") annexed hereto as **Exhibit "I"**. The Debtors believe that Leumi is the only party that may assert a perfected security interest in the Debtors' property which may constitute Collateral.

38.     The proposed Order grants the Debtors the authority to use the Collateral pursuant to Bankruptcy Code §§363 (c)(1) and (2) and Bankruptcy Rule 4001(c) to the extent necessary to continue the operation of their business and to preserve the value of their estates during the course of the Chapter 11 cases.

39.     Section 363(a) of the Bankruptcy Code state as follows:

> "In this section, "cash collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of properties subject to a security interest as provided in Section 552(b) of this title, whether existing before or after the commencement of a case under this title."

40.     Section 363(c)(1) of the Bankruptcy Code provides as follows:

> "(c)(1) If the business of the debtor is authorized to be operated under section 721, 1108, 1304, 1203, or 1204 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing".

10

41. Section 363(d) of the Bankruptcy Code provides as follows:

> "(d) The trustee may use, sell, or lease property under subsection (b) or (c) of this section only to the extent not inconsistent with any relief granted under section 362(c), 362(e), or 362(f) of this title".

42. Accordingly, pursuant to § 363(c)(2) of the Bankruptcy Code, the consent of Leumi or authority from this Court is required to use Collateral in which it holds a perfected security interest.

## Adequate Protection

43. The purpose of adequate protection is to ensure that the secured creditor receives the value for which it bargained pre-bankruptcy. In re Swedeland Development Group, Inc., 16 F.3d 552 (3rd Cir. 1994); In re Dunes Casino Hotel, 69 B.R. 784, 793 (Bankr, D.N.J. 1986), citing In re Coors of the Cumberland, 19 B.R. 313 (Bankr. M.D. Tenn. 1982). See also, In re 495 Central Park Ave. Corp., 136 B.R. 626 (Bankr. S.D.N.Y. 1992). Adequate protection is designed to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization. In re Nice, 355 B.R. 554, 563 (Bankr. N.D. Va. 2006) ("adequate protection is solely a function of preserving the value of the creditor's secured claim as of the petition date due to a debtor's continued use of the collateral").

44. Because the term "adequate protection" is not defined in the Bankruptcy Code, the precise contours of the concept are necessarily determined on a case-by-case basis. MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393 (10th Cir. 1987). In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1086); In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); In re Beker Industries Corp., 58 B.R. 725 (Bankr. S.D.N.Y. 1986); see also In re JKJ Chevrolet, Inc. 190 B.R. 542, 545 (Bankr. E.D.Va. 1995) (adequate protection is a flexible concept that is determined by considering the facts of each case).

11

45. The Order provides that, as adequate protection for the Debtors' use of Leumi's Collateral, in consideration for the use of the cash Collateral and for the purpose of adequately protecting them from Collateral Diminution[2], the Debtors shall grant Leumi replacement liens in all of the Debtors' pre-petition and post-petition assets and proceeds, including the cash Collateral and the proceeds of the foregoing, to the extent that it had a valid security interest in said pre-petition assets on the Petition Date and in the continuing order of priority that existed as of the Filing Date (the "Replacement Liens").

46. The Replacement Liens shall be subject and subordinate only to: (a) United States Trustee fees payable under 28 U.S.C. Section 1930 and 31 U.S.C Section 3717; (b) professional fees of duly retained professionals in this Chapter 11 cases, as may be awarded pursuant to Sections 330 or 331 of the Code or pursuant to any monthly fee order entered in the Debtors' Chapter 11 cases; (c) the fees and expenses of a hypothetical Chapter 7 trustee to the extent of $10,000; and (d) the recovery of funds or proceeds from the successful prosecution of avoidance actions pursuant to sections 502(d), 544, 545, 547, 548, 549, 550 or 553 ("Avoidance Actions") of the Bankruptcy Code (collectively, the "Carve-Outs").

47. The Debtors submit that, in order to preserve the Debtors' estates and ensure the viability of the Debtors during the Chapter 11 cases, Leumi should be granted Replacement Liens with the same nature, extent and validity of their pre-petition liens, subject to investigation by any creditors or committee appointed in the Debtors' Chapter 11 cases.

---

[2] For purposes of this Order, "Collateral Diminution" shall mean any diminution in value of the Secured Creditor's interest in Debtor's property as of the Filing Date by reason of Debtor's use of Cash Collateral in accordance with this Order.

48. In addition to the liens and security interests proposed to be granted pursuant hereto, the Debtors, under the attached proposed order, will, inter alia, (a) establish DIP bank accounts at Leumi, (b) pay monthly interest only payments to Leumi, at the contract rate of interest as set forth in the Waldman 2013 Note, (c) provide weekly borrowing base certificates, (d) permit, upon reasonable notice, third party monitoring by Leumi's selected representative of the Debtor's inventory and (e) provide Leumi monthly actual versus budget reconciliations.

49. The Debtor submits that, in order to preserve the Debtors' estate and ensure the viability of the Debtors during the Chapter 11 cases, it is critical that the Court approve the proposed adequate protection payments to Leumi and the grant to it of Replacement Liens with the same nature, extent and validity of Leumi's pre-petition liens, subject to investigation by any creditors or committee appointed in the Debtors' Chapter 11 cases.

### The Budget

50. The Debtors propose to use Collateral only for ordinary and necessary operating expenses substantially in accordance with the operating budget annexed hereto as **Exhibit "J"** (the "Budget"). The Debtors believes that the Budget includes only the reasonable, necessary and foreseeable expenses to be incurred in the ordinary course of operating the Debtors' business for the period set forth in the Budget. The Debtors believe that the use of Collateral in accordance with the Budget, subject to a standard 10% variance, will provide the Debtors with adequate liquidity to pay administrative expenses as they become due and payable during the period covered by the Budget.

## CONSIDERATION OF THIS MOTION ON SHORTENED
## NOTICE AND SCHEDULING A FINAL HEARING

51. The immediate and continued use of cash collateral is essential to the operation of the Debtors' business, and will not only preserve the estates but will help to maximize their value for the benefit of their creditors.

52. Federal Rule of Bankruptcy Procedure ("Rule(s)") 4001(b) requires that a motion to approve the use of cash collateral on a final basis be heard on no less than fourteen (14) days' notice.

53. However, the Rule 4001(b) further provides that if the motion so requests, the court may conduct a preliminary hearing before such fourteen (14) day period expires, but the court may authorize the use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estates pending a final hearing.

54. As set forth herein and in the accompanying Declaration of Erica Feynman Aisner pursuant to Local Bankruptcy Rule 9077-1, consideration of this motion on shortened notice is reasonable, proper and in the best interests of their creditors.

55. Finally, pursuant to Bankruptcy Rule 4001(d), the Debtors request that the Court set a date at the interim hearing for a final hearing, but in no event later than thirty (30) days after the Filing Date, and fix the time and date prior to the final hearing for parties to file objections to this motion.

**Notice**

56. This Motion is being served on notice to all of the Debtor's secured creditors as well as the United States Trustee and all other parties entitled to notice pursuant to Bankruptcy Rule 4001(d), including but not limited to the Debtors' respective twenty (20) largest unsecured creditors.

**WHEREFORE**, the Debtors respectfully requests entry of the Order, together with such other and further relief as is just and proper under the circumstances.

Dated: White Plains, New York
       June 2, 2014

                        Respectfully submitted,
                        DELBELLO DONNELLAN WEINGARTEN
                        WISE & WIEDERKEHR, LLP
                        *Proposed Counsel for the Debtors*

                        By:  */s/ Erica Feynman Aisner*
                             Erica Feynman Aisner, Esq.
                             One North Lexington Avenue
                             White Plains, New York 10601
                             (914) 681-0200